726

**BENAL THEATRE CORPORATION v. PARAMOUNT PICTURES, Inc., et al.**

No. 48 C 1599.

United States District Court
N. D. Illinois, E. D.

June 15, 1947.

Seymour F. Simon, Chicago, Ill., for plaintiff.

Miles G. Seeley, Bryson P. Burnham, Mayer, Meyer, Austrian & Platt, Edward R. Johnston and Samuel W. Block, Jacob I. Grossman and Alfred B. Teton, Matthews & Springer, and Rosenberg, Stein & Rosenberg, Chicago, Ill., for defendants.

BARNES, Chief Judge.

On May 18, 1949, the plaintiff, Benal Theatre Corporation, filed its written motion entitled "Motion for Order on Defendant Balaban and Katz Corporation to Produce for Inspection and copying or Photographing Designated Documents, Papers, Books, Accounts and Records," wherein it said:

"Now comes the plaintiff in the above entitled cause, by its attorney, and respectfully represents to the Court:

"1. This is a suit for injunctive relief brought by the plaintiff corporation under the antitrust laws of the United States.

"2. Plaintiff operates the motion picture theatre in the City of Chicago known as the Ridge Theatre and located at 1550 West Devon Avenue.

"3. The defendant Balaban and Katz is the operator of a circuit of motion picture theatres in the City of Chicago and adjoining suburbs. Its wholly or partially owned subsidiaries operate a large number of theatres in the States of Indiana and Illinois outside of Chicago. Among the theatres operated by said defendant Balaban and Katz Corporation are those hereinafter named.

"4. The plaintiff claims that because of alleged violations of the antitrust laws to which it was subjected, it was not given the opportunity to license motion pictures for exhibition in the Ridge Theatre on early and preferred runs in the City of Chicago. Counsel for plaintiff believes that defendants will attempt to justify the practices which they have followed in licensing pictures on early and preferred runs to Balaban & Katz and not to the Ridge on the ground that the theatres operated by Balaban & Katz were able to pay the defendant distributors more money for their pictures than the plaintiff could pay for their exhibition at the Ridge, and that said Balaban & Katz theatres paid the defendant distributors high film rental. It is, therefore, relevant and material for the plaintiff to know how much the defendant Balaban &

Katz did pay the defendant distributors for pictures and also to be able to show that the Ridge Theatre, when playing on an early and preferred run, could afford to pay the defendant distributors as much for their pictures as Balaban & Katz theatres paid, and that the prices at which the defendant distributors licensed pictures to Balaban & Katz were ridiculously low.

"5. The books and records requested concern several theatres whose run has been improved during the past several months by the defendant distributors, and the plaintiff desires to show that an earlier run is preferable because it increases the profit of the theatre whose run is advanced.

"6. The film rental information requested duplicates to some extent information previously furnished by the defendant distributors by way of interrogatory answers. It is desired to check the accuracy of the information furnished by comparing it with the Balaban & Katz records.

"7. Plaintiff also claims that the defendant Balaban & Katz buys pictures from the defendant distributors for all of its theatres as a circuit, and the film rental which the defendant Balaban & Katz agrees to pay is then allocated to various theatres in the circuit. For that reason, plaintiff desires to show that the film rental at which pictures were licensed to various Balaban & Katz theatres by the defendant distributors did not bear any relation to the gross receipts which those theatres normally enjoyed, and that adjustments or lower film rentals were granted to Balaban & Katz in certain situations to compensate for higher film rentals paid in competitive situations.

"8. Plaintiff also desires to show that Balaban & Katz juggled runs in its theatres at will to best suit its rental arrangements with its lessors.

"Wherefore, the plaintiff respectfully moves that the defendant Balaban & Katz be ordered to produce for inspection or copying or photographing by the defendant or its attorney, the following:

"A. All books, records and accounts of Balaban & Katz and its wholly and partially owned subsidiaries reflecting or containing entries with respect to admission rev-

enues, other income, features film costs, other film costs, advertising expenses, salaries and charges, licenses, taxes, repairs, supplies and materials, heat, power and light, rent, interest, insurance, adjustments, modifications, rebates or allowances on film and all other expenses in connection with the acquisition and operation of the following named theatres since February 1, 1942: (naming 25 theatres)

    \*    \*    \*    \*   . \*    \*

"B. If said books, records and accounts shall show, or it shall otherwise appear, that any item of income or expense or any rebate, adjustment or allowance on film rental credited or charged to any of the above named theatres during said period was a proration or allocation of income or expense involving other theatres or enterprises owned or operated by Balaban & Katz, then all such further books, records and accounts as may reflect or contain entries with respect to the total amount of such prorated income or expense.

"C. All books, records and accounts of the defendant Balaban & Katz and its wholly or partially owned subsidiaries reflecting or containing entries with respect to admission revenues, feature film costs and other film costs and modifications, adjustments, rebates and allowances of film rentals in connection with the operation of all theatres operated by Balaban & Katz and its wholly or partially owned subsidiaries since February 1, 1942."

Attached to the motion is an affidavit of counsel for the plaintiff wherein he says: "that he is attorney for plaintiff herein; that he is charged by his client with the responsibility for the conduct of this case; that he has studied the pleadings and is familiar with the issues thereby raised; that he is experienced in the preparation and trial of causes involving similar issues of law and of fact and that in his opinion inspection of the books, records and other documents enumerated in the foregoing motion is essential to the proper preparation for trial of the claims made by plaintiff. He further says that upon the request of the accounting firm of Touche, Niven, Bailey and Smart, which, he is informed and believes, has been employed by all defend-

ants in this action, he has voluntarily consented to an inspection by said accountants of books and records of similar character to those whose inspection by plaintiff is requested by this motion."

On May 23, 1949, the motion was argued orally by counsel for the respective parties. The transcript shows that the following proceedings were had on that day:

"By the Clerk: No. 48 C 1599, Benal Theatre against Paramount.

"By the Court: Proceed.

"By Mr. Simon: May it please the Court, one category of documents that I wish to inspect are books which show admission revenues received by Balaban & Katz.

"By the Court: Show what?

"By Mr. Simon: Books which contain entries regarding admission fees received by—

"By the Court: Admission?

"By Mr. Simon: Admission, yes, sir.

"—admission revenues received by Balaban & Katz, and its subsidiaries; and books which show the cost of film at Balaban & Katz theatres, and any modifications, adjustments, rebates and allowances on film rentals received by Balaban & Katz or its subsidiaries.

"The reason we want to inspect those books to get that information is threefold.

"First, we expect that it will show that the greater number of theatres in a given area which play a picture on an early run the larger the gross receipts, the combined gross receipts of the theatres that play that picture are, and therefore the higher film rentals the distributor of that picture can expect.

"The second reason that we want this is to check the accuracy of certain answers to interrogatories which have been previously submitted to us on film rentals paid.

"The third, and most important reason—and this is the principal reason, your Honor, is this: It is our claim that when Balaban & Katz buys a picture it buys it as a circuit; it buys it for all of its theatres at one time.

"Now, when it makes a deal with the distributor and allocates film rental to various theatres, it may allocate a higher film rental than ordinary to the theatres which are in the vicinity of the plaintiff's theatre, the Ridge Theatre. And we want to find out whether Balaban & Katz is compensated for that by a lower film rental in another theatre somewhere else where it has no competition—a lower film rental than would ordinarily be expected there, or by rebate, modification, adjustment and allowance on film rentals either in the theatres near the Ridge or in some other theatres that the picture is played.

"Those are the reasons that we want that type of information, your Honor.

"In addition to that, we have asked for an audit on certain specific named theatres in Chicago, and some of the suburbs adjoining Chicago, in Evanston and in Berwyn.

"The reason we want to make this audit is to show, first, that a theatre makes more money in the City of Chicago when it plays on an early run than when it plays on a late run.

"Second, the defendants, as they have in other cases, are going to come into court and say that they sell Balaban & Katz because Balaban & Katz is a fine customer, they enjoy doing business with Balaban & Katz, they have had pleasant business relations with Balaban & Katz over the years.

"We hope to show by this audit that the leading Balaban & Katz theatres in the city pay an unreasonably low percentage of their receipts to these distributors as film rental, considering the operating expenses of those theatres. And in view of that we think that it is reasonable to expect that in the absence of a conspiracy and in view of that condition the distributors of motion pictures would encourage us to bid for their pictures—would want us to bid for their pictures, instead of telling us, as the situation has been, 'There is no way you can bid; Balaban & Katz is our customer, we sell them all pictures for exhibition first, and the only way you can buy these pictures is to show them after Balaban & Katz gets through playing them'.

"The third reason we want to make the audit of these specific named theatres, your Honor, is to show that Balaban & Katz

juggles the runs of its theatres—pushes the runs of theatres up or puts the runs of its theatres back in order to best suit its arrangements with its lessors; that is, where they have a percentage lease with a lessee the run of the theatre may be held back, and if the time comes when that lease arrangement with that lessor is changed so that they no longer pay the lessor a percentage of the gross receipts, then we find that the run of the theatre is advanced, because the extra income that comes to Balaban & Katz from that increase in run can be kept by Balaban & Katz instead of their having to share it with the landlord.

"Several weeks ago the defendants asked me to permit them to send auditors to inspect our books. And I have consented to that. And for at least the past two weeks they have been down at our offices making the type of inspection of our books that we want to make of the books of the defendant, Balaban & Katz.

"By Mr. Johnston: May it please the Court, this is not a suit for damages. This is a suit for injunction, merely.

"The basis, or alleged basis for an injunction is a conspiracy—a present conspiracy, a conspiracy existing at the time of the filing of the bill, and a threat, of course, of the continuance of that alleged conspiracy.

"It seeks merely an injunction to prevent the defendant distributors of motion pictures from preventing the plaintiff, which is a local theatre, a neighborhood theatre out on West Devon Avenue, from obtaining a prior run, or broader run of pictures in competition with the neighborhood theatres in the neighborhood of the Ridge Theatre.

"That is the issue presented by this bill and by the answers which will be filed to the bill.

"What the plaintiff is seeking in this case is this: He is asking your Honor to enter an order under Federal Rules of Civil Procedure, Rule 34, 28 U.S.C.A., which will permit an examination of the books of every Balaban & Katz theatre, whether located in Illinois, whether located in Ohio, or elsewhere.

"The bill alleges that there are fifty Balaban & Katz theatres in Chicago; that there are seventy outlying theatres in the State of Illinois, operated by subsidiaries and some in the State of Ohio, and I believe in some other States.

"The order which is presented to your Honor, and the request which is made that we be required to submit to an investigation on that sort of an issue, an issue for an injunction based upon a conspiracy which affects only that local theatre in its right to compete against the theatres in its immediate vicinity—an investigation of the books of Balaban & Katz in these one hundred and twenty-odd theatres throughout this great territory.

"Not only what film rentals are being paid, but this order asks for all of the details of cost of Balaban & Katz in the operation of every one of these one hundred and twenty theatres—what they pay for rent; what they pay for light; what they pay for heat; and what they pay for every item of expense in connection with the operation of these theatres.

"Now, if the Court please, these rules were not designed for any such purpose as that. As your Honor knows well, they were designed to liberalize the rules of obtaining evidence in order to speed the trial of cases.

"They were not designed, and there is nothing in the rules which permits any such wholesale investigation of the books and records of a competitor, as the plaintiff seeks in this case.

"The limits of materiality under the allegations of this bill would be to determine what film rentals were paid by Balaban & Katz to these defendant distributors by the theatres in this small, local competitive area where the plaintiff's theatre operates. That might be material, what film rentals were paid. That might have something to do with the question of the alleged conspiracy or the impact of the alleged conspiracy.

"But what possible relevancy to the issues submitted in this suit does it have to find out what Balaban & Katz pays one of

its large theatres in the City of Chicago, or one of its central theatres, or two or three of its outlying theatres on the North Side which does not compete with this small neighborhood theatre, or what its rentals or other expenses are in connection with the operation of those theatres?

"Your Honor, it is simply preposterous. It as no relevancy. And it does not come within this rule, which is that there must be relevancy to the subject matter.

"It is done clearly, not for the purpose of obtaining information for this suit; it is done for a purpose—one purpose, and that is to attempt to sufficiently annoy Balaban & Katz, one of these defendants, by subjecting all its books for all of these theatres to a series of examinations so as to force Balaban & Katz in some way to settle, or to agree to a settlement of this suit.

"The other purpose is that this same attorney has ten of these cases pending; he has brought ten of these cases in this Court against the same general group of defendants, for the same general relief, and in some cases making large claims for damages. And this general spread of information is for the purpose of aiding the plaintiff's counsel, not only in these pending cases, but in the starting of other cases that are being commenced now about once a week; and in fact the thing has become a regular racket since the decision in the Bigelow case.

"But not this sort of order, the sort of order that is sought here. We have no objection to an examination of our books as to the merits of this case, on the question of whether there was, or is a present conspiracy. But not going away back. And mind, he is asking to go back to 1942, a seven-years' examination. On no possible theory can that be material.

"There, of course, are allegations in the bill about prior conspiracies of other groups of respondents, some of whom are involved here and some not.

"And as your Honor knows, the question which your Honor will decide is, was there a conspiracy? And is there now a conspiracy existing at the time this bill was filed, which prevents this plaintiff from obtaining its rights with respect to the purchase of film? Not what was done in the past, which has nothing whatever to do with the question of an existing conspiracy. Yet he is asking to go back to 1942, and for a period of seven years to examine the books of the hundred and twenty theatres scattered throughout this particular western territory.

"I cannot think of anything which would seem to me to be more clearly a perversion of what was intended by these rules.

"Your Honor is entirely familiar with it. The language now of course refers to the language for clarification to 26(b). And 26(b) of course makes it clear that the matter must be something relevant to the general subject matter of the inquiry of the suit, something which will either produce evidence or open up evidence to disclose facts which would aid the plaintiff either in prosecuting his suit or in aiding him in defending against the defense presented by the defendant respondents.

"I submit to your Honor that this sort of an order does not come within a million miles of that, and not only would be a most intolerable burden upon this one defendant. But mark what the plaintiff says in his petition.

"The reason he is asking this is because all these distributors—not these defendant distributors—are going to claim that they get more film rental when they sell to theatres in the immediate vicinity of his theatre than if they sell to his Ridge Theatre. And yet he is seeking this information from Balaban & Katz, which is his competitor in that local area, because it has a theatre or two in that general vicinity which can be said to compete with his theatre.

"That is the scope and nature of the relief which is sought.

"I submit to your Honor that when the Supreme Court passed on Rule 34 in the Hickman v. Taylor case, 329 U.S. 495, 67 S.Ct. 385, 387, 91 L.Ed. 451, which your Honor knows is probably the most exhaustive discussion of Rule 34, they used this language: 'Examination into a person's files and records.'

"Of course, that was an individual situation, and not a corporation: '* * * including those resulting from the professional activities of an attorney, must be judged with care. It is not without reason that various safeguards have been established to preclude unwarranted excursions into the privacy of a man's work. At the same time, public policy supports reasonable and necessary inquiries.'

"The same thing, as your Honor knows, runs all through the decisions mostly of the District Courts, because very few of these cases have gone up on appeal with respect to the examination of books and records. And if the examination is of the books and records of the competitor, the court will, as the Supreme Court says in this case, proceed with care to not compel the disclosure of books and records which may not have any relevancy to the general subject matter of the inquiry or to the lawsuit.

"The Court should take into account the fact that this plaintiff's counsel here is bringing one of these suits on the average once a week, or once every two weeks, by a new plaintiff, seeking this same sort of relief.

"If we are to be subjected to this sort of thing it becomes an intolerable burden, the sort of thing which the court certainly had in mind in Rule 30(b) when it said the court should have the right in its discretion to protect a defendant against the unreasonable application thereof through such examination or discovery of documents.

"And I submit, your Honor, there is no suggestion here for permitting this plaintiff to do more than examine and determine from the books pertaining to this immediate neighborhood—and he has indicated what those theatres are in that immediate vicinity out there, to find out what film rentals they paid to these various distributors, which may have some relevancy. But beyond that he has no right to go. And it would be a gross imposition, I say, to require any such discovery as he is now seeking in this case.

"I thank you.

"By Mr. Simon: Your Honor, I should like to say—

"By Mr. Johnston: Let me just say this. This defendant did not ask for an examination of the plaintiff's books. Some of the distributors did. But we haven't asked for any. But that would be perfectly proper anyway.

"By Mr. Simon: I should like to take just a minute or two, your Honor, to comment on what I consider a personal attack that Mr. Johnston has made upon me and upon my integrity.

"It is true that I have filed a lot of these cases. I assume the reason for it is that I have gained some familiarity with the motion picture business and with the way motion pictures are sold, with the way the defendants have conducted the motion picture business. But I think it ill becomes counsel for the defendant Balaban & Katz and Paramount, of whom the Supreme Court has spoken in the terms it spoke in its decision of last spring in U. S. v. Paramount, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, to accuse counsel and clients who are now suing that defendant to compel it to comply with the spirit of the opinion of the Supreme Court, of operating a racket.

"The reason that all these suits have been filed since that Supreme Court opinion is that the Supreme Court found that there was a conspiracy to monopolize trade and commerce; they found that there had been a violation of the antitrust laws; and at least four of the defendants in that connection, Mr. Johnston's clients, Paramount, and Balaban & Katz, Warner Bros., Universal, Columbia and United Artists have made no attempt to even comply with the Supreme Court's opinion and with the spirit of that opinion. They still tell you, your Honor, as they always have in the past when we ask to be able to license their pictures—and this is not only the Ridge Theatre itself, every independent theatre in the City of Chicago except those that have brought lawsuits, and every one, they all told them, and they tell each of these theatres, 'Go away, we sell to Balaban & Katz. We don't want to sell you. We are not interested in permitting you to compete. We don't care what you are paying for these pictures. Balaban & Katz is our customer. And when Balaban & Katz gets through

playing them you can play them in the hierarchy of operation that we have always followed in Chicago'—the old playing position which the Supreme Court held to be illegal in the Jackson Park case. [Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652].

"And that is why, as I have said to your Honor, this Court is flooded with these lawsuits.

"Apparently they will think they have a God-given right, so that when someone challenges their right to play pictures counsel comes in and accuses those people of running a racket.

"We have been all through this, your Honor, on the questions which Mr. Johnston has raised, when he says that this case ought to be confined to the North Side of Chicago, and that we should not go into the South Side of Chicago. We had that question up before your Honor, and your Honor ruled that it was material what the distributors received for pictures in South Side theatres.

"Since that time these interrogatories have been answered, and I believe that they prove the point that I predicted they would prove at the time of the argument, that Mr. Johnston's own client, when it sells the Jackson Park Theatre, or the Piccadilly Theatre or the Tivoli Theatre to pay day and date on the South Side the first run gets more money from those pictures as a distributor than it might when it is sold to its own theatre, the Tivoli, exclusively.

"Mr. Johnston says that the thing that is at issue here is what the theatres around the Ridge paid for pictures. I assume that he means the Uptown, the Granada, the Northtown—and I agree that that is the thing at issue, your Honor. But we want to find out what in fact those theatres pay for pictures; the matter of what the books of a circuit like Balaban & Katz show that these theatres pay for pictures may be just a matter of bookkeeping. There is nothing to prevent them from paying fifty or sixty percent of their gross receipts to Warner Bros. for the Uptown, the Granada or the Northtown Theatres, and then coming in here and saying, 'Look, we paid $8,000 for

this picture at the Northtown. You can't possibly offer Warner Bros. that price. That is why they sell us."

"We want to make this inspection, your Honor, to make sure that these prices are bona fide film prices, and that somewhere else in the circuit they do not counterbalance that eight thousand dollars off and get the pictures at five percent of the gross receipts or at ten percent of the gross receipts.

"And actually, the check that I want to make here is for the purpose of satisfying ourselves and satisfying the Court that the film rentals paid at these threatres are bona fide film rentals which are paid throughout the Balaban & Katz circuit, and not just in a competitive situation where litigation is pending so that they have a pretty picture to come into court with and to offer in evidence at the trial of the case.

"I think Mr. Johnston also has misread the motion. I have asked for details of expenses, such as rent and costs other than film costs, only for certain specifically named theatres in the city. Outside of those specifically named theatres the only item of costs as I stated before that I want, are the expenses of feature film costs and other film costs and modifications and adjustments and refunds and allowances on film rental, in addition to their admission revenues. I do not care about any of the other costs.

"By the court: I will take the papers and I will let you know what I think about the matter within a week.

"By Mr. Johnston: If I might say, counsel is in error: We are operating under a decree, and we are following that decree. The decree has been entered in the Paramount case."

The defendant Balaban & Katz Corporation then filed a paper entitled "Objections of Defendant Balaban & Katz Corporation to Plaintiff's Motion for Order on said Defendant to Produce for Inspection and Copying or Photographing Designated Documents, Papers, Books, Accounts and Records," wherein it said:

"Balaban & Katz Corporation, one of the defendants in the above-entitled cause, by

its attorneys, hereby respectfully represents to this Court, in opposition to the motion for an order on Balaban & Katz Corporation to produce for inspection and copying or photographing certain designated documents, papers, books, accounts and records, the following:

"1. This is a suit for injunctive relief brought by the plaintiff corporation under the anti-trust laws of the United States. It alleges, as it must, a *present* conspiracy involving Balaban & Katz Corporation and a number of defendant distributors. It is further alleged that this conspiracy *presently* is intended to and does deny to the plaintiff certain rights to purchase competitively feature motion pictures for exhibition in the Ridge Theatre in the playing position to which the plaintiff considers that the Ridge Theatre is entitled. The allegation of *future* damage is also included, as required by the statute.

"2. The plaintiff has served upon the various distributor defendants, and Balaban & Katz Corporation, a large number of interrogatories answers to which interrogatories are, in whole in part, in the files of this Court. Said interrogatories contain, for various pictures in various theatres, details as to film rental paid by the particular exhibitor for the particular picture in each theatre. In the case of pictures played under contracts calling for rental to be determined by a percentage of gross receipts, the answers to the interrogatories also set forth the gross receipts of the theatre for the week or weeks in which the particular picture so licensed was exhibited.

"3. Plaintiff's motion here objected to is for discovery under Rule 34. It demands, first of all the right to make complete audits for the following twenty-five theatres for the years since February 1, 1942: (naming 25 theatres)

\*　　\*　　\*　　\*　　\*　　\*

"(a) Although plaintiff has been requested to supply defendant Balaban & Katz Corporation with the names of theatres with which the plaintiff considers the Ridge Theatre to be in substantial competition, plaintiff has not done so. Plaintiff's excuse, given orally, has been that it is uncertain whether both the Granada and the Northtown Theatres are in substantial competition with the Ridge, or only the Granada Theatre. Plaintiff in the instant motion demands intimate details for a period of seven years for twenty-five theatres, covering not only the competitive area surrounding the plaintiff's theatre, but also including theatres in Evanston and on the far south and west sides of Chicago;

"(b) Although plaintiff's complaint alleges a *present* conspiracy threatening plaintiff with *future* damage, the instant motion demands details for a period of seven years in the past. As the plaintiff's complaint shows, the method of licensing motion pictures for exhibition in the City of Chicago has changed since December, 1947, over a year *prior* to the filing of this suit. The manner of licensing pictures has, since December 1, 1947, been in accordance with the decree of this Court in the case entitled, 'Bigelow v. RKO Radio Pictures Corporation, Inc.' (Complaint, para. 25);

"(c) The details of income and expenses demanded by plaintiff, including rentals paid for particular theatres, are not for the purpose of preparing its case or defense in the instant matter. They are for the purpose of harassing the defendant Balaban & Katz Corporation, and for aiding plaintiff's counsel in the prosecution of the many other suits which have been filed in this District, or which plaintiff's counsel threatens to file;

"(d) The plaintiff's demand for the audits referred to in paragraph (a) of the motion (page 3) has no relevancy whatever to the case which plaintiff's complaint attempts to allege.

"4. Plaintiff's motion, in addition to the demand for the audit of twenty-five theatres, further demands an audit of all books, records and accounts for 'other theatres or enterprises owned or operated by Balaban & Katz' (Para. (b), page 3.) It is true that the further audit is to be demanded only if the audit of the twenty-five theatres discloses 'or it shall otherwise appear,' that *any* item of income or expense or *any* rebate, adjustment or allowance on film rental credited or charged on the books

of any of the twenty-five theatres prove to be a proration or allocation involving other theatres of the Balaban & Katz circuit. It is obvious that plaintiff will be able to claim that it at least 'otherwise appears' that a proration is involved in some item of income or expense and thus demand, under the order, a complete audit of all of the books and records of Balaban & Katz Corporation for all of its 120 theatres.

"5. Even if limited solely to the twenty-five theatres named, the audit demanded goes far beyond any discovery to which plaintiff is properly entitled and is a clearly unwarranted excursion into the privacy of the Balaban & Katz operation. This is particularly true where, as here, the demand is made on the part of a competitor or Balaban & Katz and by an attorney whose constant harassment of the distributors and exhibitors makes clear the purpose for which the audit is sought.

"6. The motion here objected to further requests all admission revenues and film rentals for all of the Balaban & Katz theatres. Plaintiff alleges in the complaint that 120 theatres at a minimum are involved in this demand. Clearly, the film rental and admission revenues in theatres other than those in the immediate competitive area of the plaintiff theatre are in no sense material and relevant. The sole question presented by the complaint is whether or not a conspiracy existed at the time of the filing of the complaint, and now exists, which denies to the plaintiff the rights to which it would otherwise be entitled. The motion for a discovery of 'admission revenues, feature film costs and other film costs and modification, adjustments, rebates and allowances of all film rentals in connection with the operation of all theatres operated by Balaban & Katz and its wholly- or partially-owned subsidiaries since February 1, 1942" is so extensive as to label it for what it is—an unwarranted excursion into the privacy of the operation of the Balaban & Katz theatres.

"7. Plaintiff's motion states that all of this information is necessary in order to counter what plaintiff argues will be a defense put up by the defendants; i.e., the amount of film rentals that Balaban & Katz was able to pay the defendant distributors. This issue is one solely involved in the amount of rental paid by the theatres in the immediate competitive area of the Ridge Theatre, which film rentals plaintiff has already obtained from the defendant distributors by way of interrogatory. There is no reason for plaintiff to demand this information from the defendant Balaban & Katz Corporation, the sole exhibitor defendant in the case and the immediate competitor of the plaintiff.

"8. Plaintiff further states in support of its motion that it requires the information 'to check the accuracy of the information furnished by the defendant distributors in their interrogatory answers.' If this is honestly what plaintiff desires, appropriate methods of limited inquiry are available to it without the broad scale demands for discovery which, by their very area, disclose themselves as improper utilization of the Federal Rules.

"Wherefore defendant Balaban & Katz Corporation by its attorneys respectfully moves that the motion for discovery be denied, or, in the alternative, that it be limited solely to film rentals and admission revenues in the theatres in the immediate competitive area of the Ridge Theatre, which theatres the plaintiff be required to name."

Attached to the Objections is an affidavit of counsel for the defendant Balaban & Katz Corporation, wherein he says:

"1. He is counsel for Balaban & Katz Corporation, one of the defendants in the above-entitled matter and as such is charged with the preparation of its defense.

"2. He has read the motion of plaintiff for discovery, to which motion objections have been filed by Balaban & Katz Corporation and has read the objections of Balaban & Katz Corporation to said motion; that in his opinion said motion is improperly based on the facts and the law for the reasons set forth in said objections.

"3. He has read the objections to said motion filed on behalf of said Balaban & Katz Corporation and that the statements therein are true and correct."

Subsequently, the plaintiff filed another paper which it entitled "Plaintiff's reply to Objections of Defendant Balaban & Katz Corporation to Plaintiff's Motion for Order on said Defendant to Produce for Inspection and Copying or Photographing Designated Documents, Papers, Books, Accounts and Records," wherein it said:

"Counsel for Balaban & Katz Corporation (herein called "B & K"), conceded in oral argument that the data requested by plaintiff with regard to theatres in the immediate competitive area of plaintiff's theatre, the Ridge, was relevant. This data is meaningless, however, unless plaintiff is given the opportunity to determine whether bookkeeping entries showing film rentals paid by B & K theatres in the immediate competitive area of the Ridge represent bona fide film rentals paid. B & K operates a large circuit of theatres and buys the same pictures from the same distributors for most of these theatres. It would be a simple matter, therefore, for B & K and the distributors to show as matters of bookkeeping record that B & K theatres around the Ridge paid certain prices for film and at the same time grant film rental rebates to other B & K theatres or license film to other B & K theatres at reduced rentals or at prices which bore an unreasonably low relation to the gross receipts of such other B & K theatres. That is a simple matter of taking it out of one pocket and putting it in another. To check whether this was done, plaintiff is required to examine the film rentals paid by all B & K theatres and the admission receipts of those theatres.

"Plaintiff feels that prior to the trial of this case the precaution of making an examination to determine whether bookkeeping entries in the defendants' books represent bona fide film rentals must be taken, particularly in view of the recent comments of the United States Supreme Court in U. S. v. Paramount Pictures, et al., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed 1260 about the character and integrity of the defendants in that case, who are also defendants in this action.

"The Supreme Court said at 334 U.S. 131, 68 S.Ct. 925, 92 L.Ed. 1260, in referring to the defendant film companies:

'Those who have shown such a marked proclivity for unlawful conduct are in no position to complain that they carry the burden of showing that their future clearances come within the law.'

"Again, at 334 U.S. 131, 68 S.Ct. 924, 92 L.Ed. 1260, in denying the defendants, in granting clearances, the right to take into consideration what is reasonably necessary for a fair return to the licensor, the Supreme Court said: 'That is too potent a weapon to leave in the hands of those whose proclivity to unlawful conduct has been so marked.'

"Again, at 334 U.S. 131, 68 S.Ct. 932, 92 L.Ed. 1260, the Supreme Court referred to the defendants as 'those who had the genius to conceive the present conspiracy and to execute it with the subtlety which this record reveals.'

"That is the principal reason plaintiff requests the opportunity to examine the books and records of B & K and its subsidiaries containing entries with respect to admission revenues, film costs and modifications, adjustments, rebates and allowances of film rentals. In addition, this examination will enable the plaintiff to check the accuracy of certain film rental figures which have already been furnished by way of interrogatory answer, and will enable the plaintiff to show that, as the plaintiff contends, it is to the economic advantage of a motion picture distributor to encourage a large number of theatres in a given area to play its pictures on an early run instead of limiting that run to a small number of B & K theatres as they have done heretofore.

"In addition to the examination outlined above, plaintiff is requesting permission to make an audit of the records of 25 specifically named B & K theatres in Chicago and suburbs adjacent to Chicago. Counsel for plaintiff is certain that the defendants, at the trial of this case, will attempt to show that even though the plaintiff has been deprived of the opportunity of obtaining first run pictures, it has not been damaged by such deprivation. The audit requested with respect to the specifically named theatres will answer this defense by showing that

the earlier a theatre plays pictures in relation to other theatres in its vicinity, the more money that theatre makes. In addition, counsel for plaintiff feels certain that the defendants will attempt to justify their practice of licensing early and preferred runs of pictures to B & K on the theory that B & K was a splendid customer which paid them generous film rentals. Plaintiff expects that the audit it desires to make will show that B & K was not a good customer, but rather, a very poor customer, and that its theatres which played on early and preferred runs enjoyed exorbitant profits in which the distributors were not permitted to share because the monopoly position of B & K forced the distributors to sell B & K at film rentals which bore no reasonable relation to the profits which B & K was able to make from the showing of their pictures. Finally, plaintiff expects to show by this audit of the records of the specifically named theatres that B & K was able, because of its monopoly, to juggle runs in its various theatres to best suit its arrangements with its landlords. That is, a theatre which was leased by B & K at a percentage rental was played in a position inferior to the playing positions of theatres which B & K owned or which B & K leased at a straight rental figure.

"B & K objects to this examination because it covers theatres on the south and west sides of Chicago. We have already been through that argument once in this case in connection with the objections of the defendant Paramount, which is represented by the same counsel as B & K, to interrogatories propounded by plaintiff relating to south side theatres, and Your Honor ruled that the information requested was relevant and ordered the defendants to answer the interrogatories. The answers to those interrogatories, which have since been submitted, show what counsel for plaintiff at the argument on the objections to the interrogatories predicted they would show, namely, that Paramount as a distributor gets more film rental from the first run exhibition of its pictures on the south side of Chicago by licensing them to the Tivoli, Jackson Park and Piccadilly Theatres to play simultaneously, than Paramount got prior to the entry of the Decree in this Court in the Jackson Park Case, when it limited the first run license on the south side to the Tivoli Theatre. For example, the highest film rental Paramount received from the Tivoli Theatre in the year 1947 was $4,364.00 on the picture California. In the year 1948, the combined film rental it received from the Jackson Park and Tivoli on Unconquered was $6,159.00 and the combined film rental it received from the Tivoli, Jackson Park and Piccadilly on Emperors Waltz was $7,186, and on Sorry Wrong Number, $7,324. The interrogatory answers filed by the other defendant distributors show the same thing, namely, that the Decree which this Court entered in the Jackson Park Case was to the economic advantage rather than the economic disadvantage of the distributors. It at least partially freed them from the shackle-hold of the B & K monopoly and permitted them to sell their pictures on early runs on the south side to other exhibitors than B & K. Yet, on the north side of Chicago, to which the Decree in the Jackson Park Case does not apply, the defendant distributors continue to do business in the same old way and at the same old stand. On the north side, they still limit the early run of pictures to the B & K theatres.

"Much has been said by counsel for B & K, both in oral arguments and in their written objections, about the motives of counsel for plaintiff in presenting this motion. As a matter of fact, the charges made by counsel for B & K, if true, might even warrant disciplinary action by this Court against counsel for plaintiff, and it therefore surprises counsel for plaintiff that attorneys who have as eminent and respected a standing at this Bar as counsel for defendants, would make such charges, particularly under oath, without mature and careful consideration, and without well-founded proof. The charges are not only vicious untruths, but also are absurdly unrealistic.

"In the oral argument, counsel for B & K stated that the purpose of the motion was to harass his client into making a settlement of this matter. In view of this

statement, it is only fair to advise the Court that counsel in this matter have discussed settlement at great length, and approximately two weeks ago all counsel agreed that there was no possible basis for settlement and that the case would have to be tried. Counsel for plaintiff, having already spent considerable time in settlement discussions, does not expect to devote any more time to such discussions, since such time would be at the expense of his trial preparation.

"Then, counsel for B & K claim that the purpose of the examination which plaintiff seeks to make it so that plaintiff's counsel will be aided in the prosecution of other suits which have been filed in this district or which plaintiff's counsel threatens to file. The examination which plaintiff is requesting permission to make will require the employment of trained accountants at considerable expense. Those accountants have already been engaged by plaintiff, subject to the Court's ruling on this motion, and they are being paid by plaintiff. Is it not absurd to believe that plaintiff would go to the expense of employing accountants to make an examination of defendants' books for the purpose of assisting plaintiff's counsel in the prosecution of other matters in which plaintiff has no interest?

"Sometime ago the defendants requested that their accountants be permitted to examine the plaintiff's books and records. Counsel for plaintiff, knowing your Honor's desire that the parties to an action be given access by discovery to all matters which may reasonably be required in preparation for trial or to be offered in evidence, did not feel warranted in taking the time of the Court to object to the request, and, therefore, consented to the examination. For the past two weeks, plaintiff's books have been made available to those accountants and working space has been provided for them in plaintiff's office. Plaintiff desires that its counsel be as thoroughly and carefully prepared to present its case and to meet all defenses which may be raised, as are counsel for defendants. For that reason, we desire to make the inspection re-

quested in advance of trial, so that it will be unnecessary for plaintiff at the trial to request the production of the same records and then take the time of this Court and counsel and the paries to make an examination of them in the Courtroom."

Finally, the defendant Balaban & Katz Corporation filed a paper which it entitled "Defendant Balaban & Katz Corporation Answer to Plaintiff's Reply to Objections of Balaban & Katz Corporation to Plaintiff's Motion for Order for Inspection," wherein its said:

"Plaintiff has filed a reply to the objections of defendant Balaban & Katz Corporation to plaintiff's motion for an order on said defendant to produce for inspection and copying or photographing designated documents, papers, books, accounts and records. Because of the manner in which Balaban & Katz Corporation's original objections were presented to this Court, it is necessary to assume that plaintiff has stated in its reply its position in support of its motion.

"Plaintiff first argues in support of its demand for all film rentals that it seeks to determine whether or not the film rentals paid by the theatres 'around the Ridge' represent bona fide film rentals. To determine this, plaintiff argues, it must see what other Balaban & Katz theatres paid for film and must determine whether or not any rebates were granted by the distributors. Such an argument is merely an admission by plaintiff that the information which it demands by way of examination of Balaban & Katz' books, its exhibitor competitor, could be as readily obtained by interrogatories to the distributor defendants. As pointed out in the objections of Balaban & Katz already filed with the Court, the distributor defendants have been interrogated as to the film rentals paid by Balaban & Katz in most of the theatres in the period in question.

"Plaintiff flatly states, at page two of its reply, 'that is the principal reason plaintiff requests the opportunity to examine the books and records of Balaban & Katz and its subsidiaries containing entries with re-

spect to admission revenues, film costs and modifications, adjustments, rebates and allowances of film rentals.' Such a 'principal reason' does not in any way sustain plaintiff's right to examine the books and records of its competitor.

"In support of both its claim for the right to inspect film rental figures and the further claim of right to make an audit of twenty-five theatres, plaintiff also argues that it will show 'it is to the economic advantage of a motion picture distributor to encourage a large number of theatres in a given area to play its picture on an earlier run instead of limiting that run to a small number of B & K theatres as they have done heretofore.' (Reply, p. 3). This argument directly negatives the argument plaintiff has previously made, based upon certain language of the Supreme Court in its opinion in U. S. v. Paramount Pictures, Inc., et al., 334 U.S. 131, 68 S.Ct. 925, 92 L.Ed. 1260, to the effect that clearances may be granted solely for the protection and economic advantage of the *exhibitor*. Moreover, the evidence which plaintiff cites in support of its claim for right to audit is misleading, since it attempts to compare one theatre in one year to two or more theatres in a second year. Plaintiff fails to take into account the subsequent runs that would otherwise have been enjoyed by the distributors in the theatres which, in the second year, played on earlier runs. Obviously, the economic complications of motion picture distribution and exhibition cannot be simplified by a comparison of two or three pictures in two or three theatres in any limited period. If the profits of the distributors are to be the test of reasonableness of clearance and runs, then it must be the totality of receipts from all runs of all theatres rather than the receipts from any single run in any one or more theatres.

"It is difficult to determine from plaintiff's reply what are the supporting reasons for its claim of right to make a detailed audit of twenty-five theatres operated by its competitor Balaban & Katz throughout the City of Chicago and its suburban areas. If plaintiff intends to support its outrageous demand by relying upon the plaintiff's right

to prove that 'the earlier a theatre plays pictures in relation to other theatres *in its vicinity,* the more money that theatre makes' (Reply, p. 3), it has admitted the point made by Balaban & Katz Corporation in its objections. Clearly, the complications of motion picture exhibition are such that at most a theatre can only be compared in terms of revenue potentials with other theatres 'in its vicinity' which are similar to it in size, appointments, ease of access, etc. Plaintiff's demand for a broad scale audit of twenty-five theatres covering the entire area of the City of Chicago and its suburbs stamps such motion as an unwarranted intrusion into the privacy of the business operation of its exhibitor competitor. As was pointed out in the objections of Balaban & Katz Corporation, plaintiff must be limited in its demand for information from its competitor to those theatres which are in substantial competition with plaintiff's theatre and whose appointments, location and ease of access are at least comparable.

"Plaintiff further relies, in support of its outrageous demands, upon this Court's ruling in connection with certain interrogatories directed to distributor defendants. The interrogatories directed to distributor defendants did not in any way raise the same question that is squarely presented to this Court by the broad scale demand for investigation into the books and records of a competitor contained in the instant motion. A court must be jealous to guard a business against unwarranted excursions into the privacy of its operations by a competitor, particularly where other sources are available for all of the information that may in any way be material and relevant for the instant case, or even may be considered to lead to the acquisition of material and relevant information. So a court might direct a distributor to disclose film rentals from theatres far removed from the plaintiff's theatre but refuse to permit that plaintiff to make a broad scale audit of its competitor's books when it admittedly seeks by such audit only confirmation of the data already obtained.

"All of the other points set forth in plaintiff's reply have already been covered. It

may be pertinent to note that the argument concerning the rentals paid by Balaban & Katz for the use of its theatres is so obviously an excursion into the privacy of the Balaban & Katz operation by a competitor as to stamp clearly the nature of this motion. By no stretch of the imagination can the relations between Balaban & Katz and its landlords effect the rights of the plaintiff in the instant case. It could only aid the plaintiff as a competitor of Balaban & Katz, or other competitors of Balaban & Katz."

■ Law suits such as that at bar almost invariably promptly become bitter controversies wherein everything that either side asks for by way of preparation for trial is strenuously opposed by the other side. Since these suits do become bitter and since the bitterness does not become less with the age of the controversy, it behooves the court to dispose of the suit as speedily as possible consistent with the real rights of the parties. Such opportunity of observation as the writer has had has convinced him that a liberal construction of the Federal Rules of Civil Procedure providing for pre-trial discovery brings about a speedy disposition of law suits. A liberal construction of the rules not only saves the time of the court, of counsel and of the parties by shortening the time required for trials but also contributes to bring about settlements. After the evidentiary facts have been spread upon the record and both sides have had opportunity to consider them, the parties, knowing how much or how little they really have to quarrel about, are more likely to settle their controversy.

■ By the motion now before the court the plaintiff asks for the discovery of many facts. But the mere fact that it does ask for the discovery of many facts is no reason, in and of itself, why it should be denied the discovery of all or any part of the facts requested. That the discovery of many facts is sought is a reason that the motion should have careful consideration by the court. It has had that careful consideration. The court has considered the complaint and the answers and other papers that have been filed, together with the papers and arguments above recited at length.

The real question before the court under the rule is, Has the moving party made a showing that the facts requested are relevant? The court thinks it has. Many facts are relevant because of the magnitude of the defendant Balaban & Katz Corporation. If the defendant owned and operated but one theatre the facts which might be relevant and which, accordingly, could be compelled to be disclosed would be relatively few. The fact that the plaintiff must be compelled to pay someone to make the examinations sought is, in a sense, a guarantee that needless investigations will not be made. But even if this were not so, the court would be constrained to grant the discovery requested for the simple reason that the facts sought are relevant.

The plaintiff's motion may be granted. Such an order has this day been made.